**FERGUSON CASE ORR PATERSON LLP**
David L. Shain, Esq.
1050 South Kimball Road
Ventura, California 93004
Telephone: (805) 659-6800
Fax Number: (805) 659-6818
E-mail: dshain@fcoplaw.com

Attorneys for Plaintiff
DAVID MONTGOMERY,
Individually and as Guardian ad Litem of
MICHAEL DEAN MONTGOMERY, a Minor

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT**

DAVID MONTGOMERY, Individually and as Guardian ad Litem of MICHAEL DEAN MONTGOMERY, a Minor,

Plaintiffs,

v.

WAL-MART STORES, INC.;
KINDERHOOK INDUSTRIES II, L.P.;
KINDERHOOK INDUSTRIES, L.L.C.;
KINDERHOOK CAPITAL FUND II, L.P.;
CRESTWOOD HOLDINGS, INC.;
BERGAN, L.L.C.;
JOHN ELMBURG;
ROBERT ELMBURG;
ERIC ELMBURG;
ROCKY FLICK;
HOME DEPOT U.S.A., INC.;
and Does 1 through 20, inclusive,

Defendants.

**COMPLAINT FOR:** '12CV3034 DMS WVG

1) **STRICT LIABILITY**
2) **NEGLIGENCE**
3) **BREACH OF WARRANTY**
4) **MISREPRESENTATION**
5) **VIOLATIONS OF THE CONSUMER PRODUCT SAFETY ACT**
6) **NEGLIGENCE PER SE**
7) **PIERCING THE CORPORATE VEIL AND JOINT ENTERPRISE LIABILITY**
8) **PIERCING THE CORPORATE VEIL**
9) **FRAUDULENT CONVEYANCE**
10) **FRAUDUENT CONVEYANCE**
11) **STRICT LIABILITY DESIGN DEFECT**
12) **DUTY TO WARN**

**JURY TRIAL DEMANDED**

COMES NOW Plaintiff, MICHAEL MONTGOMERY, Individually and as Guardian ad Litem of MICHAEL DEAN MONTGOMERY, a Minor, and complains of Defendants, WAL-MART STORES, INC.; KINDERHOOK INDUSTRIES II, L.P.; KINDERHOOK CAPITAL

/ / /

/ / /

FUND II, L.P.; KINDERHOOK INDUSTRIES, L.L.C.; CRESTWOOD HOLDINGS, INC.; BERGAN, L.L.C.; JOHN "CY" ELMBURG; ROBERT ELMBURG; ERIC ELMBURG; ROCKY FLICK; and HOME DEPOT U.S.A., INC., as follows:

## PARTIES

1. Plaintiff, Michael Montgomery ("Montgomery"), is an individual who is a citizen of the State of California.

2. Defendant Wal-Mart Stores, Inc. is a Delaware corporation, engaged in business in California and its principal place of business is located at 702 SW 8th Street, Bentonville, Arkansas 72716. Wal-Mart Stores, Inc. may be served with process through its registered agent CT Corporation System, 818 W. Seventh Street, Los Angeles, California 90017.

3. Defendant Kinderhook Industries II, L.P. is a Delaware limited partnership, engaged in business in California and/or with substantial contacts with California subjecting it to "long arm" jurisdiction and its principal place of business is located at 521 Fifth Avenue, 34th Floor, New York, New York 10175. Defendant Kinderhook Industries II, L.P. may be served with process through its registered agent Corporation Service Company, 2711 Centerville Road, Ste. 400 Wilmington, Delaware 19808.

4. Defendant Kinderhook Capital Fund II, L.P. is a Delaware limited partnership, engaged in business in California and/or with substantial contacts with California subjecting it to "long arm" jurisdiction and its principal place of business is located at 521 Fifth Avenue, 34th Floor, New York, NY 10175. Defendant Kinderhook Capital Fund II, L.P. may be served with process through its registered agent Corporation Service Company, 2711 Centerville Road, Ste. 400, Wilmington, Delaware 19808.

5. Defendant Kinderhook Industries, L.L.C. is a Delaware limited liability corporation, engaged in business in California and/or with substantial contacts with California subjecting it to "long arm" jurisdiction and its principal place of business is located at 521 Fifth Avenue, 34th Floor, New York, New York 10175. Defendant Kinderhook Industries, L.L.C. may be served with process through its registered agent Corporation Service Company, 2711 Centerville Road, Ste. 400, Wilmington, Delaware 19808.

6. Defendant Crestwood Holdings, Inc. is an Oklahoma corporation, engaged in business in California and/or with substantial contacts with California subjecting it to "long arm" jurisdiction and its principal place of business is located at 2505 NW Industrial Parkway, Miami, Oklahoma 74354. Defendant Crestwood Holdings, Inc. may be served with process through its registered agent, Robert Elmburg, 2505 NW Industrial Parkway, Miami, Oklahoma 74354.

7. Defendant Bergan, L.L.C. is an Oklahoma limited liability partnership, engaged in business in California and/or with substantial contacts with California subjecting it to "long arm" jurisdiction and its principal place of business is located at 27600 S Hwy 125, Monkey Island, Oklahoma 74331. Defendant Bergan, L.L.C. may be served with process through its registered agent, Eric Elmburg, 27600 S Hwy 125, Monkey Island, Oklahoma 74331.

8. Defendant John "Cy" Elmburg is an individual and may be served with process at his address: 25501 S. Highway 125, Oklahoma 74331.

9. Defendant Robert Elmburg is an individual and may be served with process at his address: 3025 S. Birmingham Place, Tulsa, Oklahoma 74008.

10. Defendant Eric Elmburg is an individual and may be served with process at his address: 55115 E. 260 Road, Afton, Oklahoma 74331.

11. Defendant Rocky Flick is an individual and may be served with process at his address: 13533 S. 500 Road, Blue Jacket, Oklahoma 74333.

12. Defendant Home Depot U.S.A., Inc. is a Delaware corporation, engaged in business in California and its principal place of business is located at 2455 Paces Ferry Northwest, Atlanta, Georgia 30339. Home Depot U.S.A., Inc. may be served with process through its registered agent CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Ste. 150N, Sacramento, California 95833.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this lawsuit under 28 U.S.C. § 1332 because diversity of citizenship exists between Plaintiff and Defendants. Plaintiff is a citizen of the State of California, and Defendants are foreign individuals and businesses that maintain their residences and principal places of business outside of the State of California.

14. The amount in controversy exceeds, exclusive of interest and costs, the sum of Seventy-Five Thousand and No/100 Dollars ($75,000.00).

15. This Court also has jurisdiction over this lawsuit because Plaintiff asserts a claim for damages under the United States Consumer Product Safety Act, 15 U.S.C. § 2072.

16. This Court has jurisdiction over Defendants because they have purposefully availed themselves of the privilege of conducting activities in the State of California and, by placing their portable gasoline containers, including the subject container, into the stream of commerce, have established continuous and systematic contacts sufficient to confer jurisdiction.

17. Jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process.

18. Venue in this district is proper under 28 U.S.C. § 1391(a)(2) because a substantial part of the events and/or omissions giving rise to this claim occurred in San Diego County, which is within the Southern District of California.

## FACTS AND GENERAL ALLEGATIONS

### The Explosion that Burned Michael

19. Plaintiff was born on December 26, 1992.

20. On the afternoon of June 20, 2002, nine-year-old Michael and two friends, ages ten and eleven, were playing in the backyard of a home in Lemon Grove, California, where Michael resided with his mother. One of the boys lit weeds with a lighter. Without warning, a nearby two plus gallon Blitz plastic gasoline container, Model Number 11810, suddenly and violently exploded.

21. As a result of the explosion the boys were instantly covered with fire and burning gasoline with Michael suffering the bulk of the blast.

22. While his friends ran for help, Michael ran towards the front of the home where a neighbor helped extinguish the flames on Michael's burning body.

23. Michael was immediately transported to the UCSD Medical Center burn unit where he underwent countless surgeries, procedures, and treatments, which were excruciatingly painful.

Three months later, he was transferred to Shriners' Children's Hospital in Sacramento where he received three months of additional treatment until he was able to be released into his father's care. Since that time, Michael has continued to undergo excruciatingly painful surgical procedures and rehabilitation for the burn injuries he suffered.

24. As a result of the explosion and the ensuing fire, Michael suffered catastrophic third-degree burns over a substantial portion of his body which left Michael permanently scarred and disfigured.

25. Upon information and belief, the cigarette lighter ignited gasoline vapors outside the plastic gasoline container and the flame followed the vapor trail back inside the container causing it to explode and/or shoot flames from the nozzle of the container like a flamethrower because the can lacked a flame arrestor.

26. The container was not modified or altered after it left Defendants' control, and the container was being used in an ordinary and foreseeable manner.

**Wal-Mart's Role as Designer of the Gas Can**

27. Wal-Mart Stores, Inc. ("Wal-Mart") is the largest retailer of portable plastic gasoline containers in the United States.

28. Wal-Mart controlled approximately 25% of the gas can market in the United States during all relevant periods of time.

29. Wal-Mart's policy of "every day low price" was dependent on a policy of "every day low cost" which lead Wal-Mart to adopt a policy of tight control over its suppliers which extended to the design of their products.

30. The subject gasoline container which caused the personal injuries giving rise to this action is a Blitz Model 11810 two-gallon container and was manufactured by Blitz, U.S.A., Inc. ("Blitz"), an insolvent Oklahoma corporation currently in Chapter 11 liquidation in Delaware.

31. During the relevant time period, Wal-Mart actually became the designer of Blitz's gas cans, having the power to dictate and actually using that power to dictate when a design change would be made, setting forth the schedule for the change, requiring monthly reports regarding design work, reviewing design prototype and actually determining when the newly designed

product was ready to go to market.

32. Wal-Mart controlled the design of Blitz gas cans, including the gas can that injured Plaintiff, that were sold not only in Wal-Mart's stores but all gas cans sold by Blitz to retailers of Blitz gas cans.

**The Defendants Elmburgs' and Flick's Actions to Get The Money Out of Blitz U.S.A., Inc.**

33. Blitz was owned by John "Cy" Elmburg, Robert Elmburg, and Eric Elmburg until approximately 2006 when Defendant Crestwood Holdings, Inc. ("Crestwood") was established to own and hold Blitz assets.

34. In the 2004/2005 time frame, Blitz was sued in a growing number of lawsuits for designing, manufacturing and selling gas cans that lacked safety devices, known as flame arrestors to prevent explosion. In these cases, Blitz gas cans had exploded and severely burned and killed multiple consumers, the majority of which were children.

35. As a result, Blitz's owners, the Elmburgs, and Blitz's President and CEO, Rocky Flick, retained a management consulting firm to advise them on how to deal with business strategy.

36. The business strategy proposed and adopted by the Defendants Elmburgs and Flick included the strategy of "get the money out before the liability goes up" and "equity reduction."

37. Rocky Flick admitted under oath that the purpose behind this strategy was to drain the company of its assets so that if a burned consumer received a large jury award, there would be no assets for that person, such as Michael, to recover.

38. The lawsuits against Blitz involved catastrophically burned plaintiffs most of whom have been burned over more than 50% of their bodies and the majority of whom were children.

39. At one time, Blitz had flame arrestors on its metal gas cans but when it began making plastic cans, it removed the arrestors from the design, leaving consumers vulnerable to the risk of explosion.

40. Since the early 1990s, lawsuits against Blitz have involved claims for hundreds of millions of dollars of medical bills, claims for excruciating pain and suffering, vocational loss, psychiatric impact and permanent disfigurement.

///

41. Despite this fact, Blitz's owners and executives retained relatively modest amounts of insurance leaving it grossly underinsured.

42. In the year Michael was burned and injured, Blitz has exhausted its insurance coverage and the company is now in bankruptcy, leaving Michael, exactly as the Elmburgs and Flick intended, without assets to recover from Blitz.

43. To execute the strategy of getting the money out before the liability went up, the Elmburgs and Flick divided Blitz's assets between Blitz and Defendant Bergan, L.L.C. ("Bergan") to transfer all of Blitz's non-gas can assets into Bergan to shield them from product liability in Blitz gas can lawsuits. Crestwood Holdings, Inc. was formed to hold the stock. Flick also was given an ownership interest for his participation and complicity. The sole purpose for these transactions was to leave plaintiffs, including Michael Montgomery, uncompensated for their horrific injuries.

44. The Elmburgs, Flick, and Crestwood then set out to sell Blitz, USA and pocket millions of dollars in proceeds before those who were injured could obtain the assets.

45. The Elmburgs, Flick and Crestwood diverted assets from Blitz for their own personal gain prevent, hinder and defraud Plaintiff and others like him who had been severely injured by Blitz gas cans. The Elmburgs and Flick managed Crestwood and Blitz in a manner that their separate corporate identities no longer existed.

46. A great injustice would be forced upon Michael if the Court were not to recognize the legal fiction of corporate separateness.

47. Through a series of transactions with related corporations, on or about September 19, 2007, Blitz USA was sold by Crestwood to a New York venture capital firm known as Kinderhook Industries, LLC. The Elmburgs, Flick and Crestwood pocketed millions of dollars that otherwise would have gone to those who were injured by their exploding gas cans.

48. On September 2, 2007, a Press Release was made announcing Kinderhook Industries, L.L.C.'s purchase of Blitz U.S.A., Inc. which stated in part as follows:

Blitz USA one of the nation's premiere product manufactures, has signed an agreement to sell the company to an investment group which includes Blitz's current President Rocky Flick and Kinderhook Industries, LLC, a New York-based private equity firm. The announcement was made

by Blitz owner John R. "Cy" Elmburg. Elmburg, who will retire following completion of the sale, said several members of the current management team at Blitz USA, including Rocky Flick have also acquired equity positions in the company in the transaction. Flick will become CEO following the close of the transaction, which is expected to be completed in the coming week. Elmburg's two sons will also be selling their company equity at this time. The Pet Division of Blitz USA, which is now Bergan L.L.C., will not be a part of the transaction.

**Kinderhook's Draining of Blitz's Assets Through Related Transactions**

49. As a result of complicated transactions which were all part of Kinderhook's purchase in 2007, Kinderhook Capital Fund II, L.P. finally ended up with the stock of Blitz through various corporate transactions by and through Kinderhook entities including Kinderhook Industries, L.L.C. and Kinderhook Industries II, L.P. (The three Kinderhook Defendants shall be referred to as "Kinderhook").

50. Upon completion of the sale, Kinderhook restructured the ownership of Blitz USA into a series of interdependent subsidiary holding companies comprised of a series of Delaware limited liability companies and corporations. In the end, Kinderhook Capital Fund II, L.P. gained ownership of Blitz Holdings, LLC which owned Blitz Acquisition Holdings, Inc., which owned Blitz Acquisitions, LLC which owned Blitz U.S.A., Inc. and Blitz RE Holdings, LLC.

51. As part of this restructuring, Kinderhook saddled Blitz with extraordinary amounts of debt, investing very little if any of its own equity in the company. The once vibrant business was now inadequately capitalized and grossly underinsured with a Board controlled by Kinderhook directors.

52. Through these transactions, Kinderhook set up a maze of corporations in a single minded attempt to insulate Blitz's assets from those individuals that the Defendants knew Blitz's gas cans already had and were continuing to injure.

53. Kinderhook then engaged in a series of transactions to drain Blitz's assets which were not conducted at arm's length.

54. Blitz paid hundreds of thousands of dollars in management fees to Kinderhook Industries II, LP whose ultimate parent was Kinderhook Industries, Inc. The amount paid in

management fees to the related entity was grossly disproportional to the amount paid to the on-site managers of Blitz USA.

55. In November of 2010, Blitz USA's gas can was found to be defective in a product liability suit in Federal Court in Utah where the jury returned a verdict for six million dollars in the death of a toddler.

56. Kinderhook immediately renegotiated Blitz's debt, increasing the burden on Blitz USA and placing Blitz in a situation where it was even more undercapitalized.

57. In February of 2011, Blitz transferred millions of dollars to Blitz Acquisitions Holdings, Inc. in yet another attempt to get assets out of Blitz. Blitz Acquisitions Holdings then purchased Reliance, a Canadian blow molding company, with the millions of dollars belonging to Blitz. This acquisition allowed Kinderhook to claim in Blitz's bankruptcy that Kinderhook was entitled to the proceeds of any sale of Reliance instead of those who had been burned and left without adequate assets to compensate them for their injuries. The sole purpose of this transaction was to benefit Kinderhook and harm the Plaintiff in this lawsuit and others like him who had been injured by Blitz' products.

58. In November of 2012, Blitz filed for Chapter 11 bankruptcy protection through which it sold off substantially all of its assets in August of 2012.

59. Kinderhook's management of Blitz was conducted with the sole purpose of draining money from Blitz USA and those who had been injured by their products to related corporate entities. These entities should not be recognized as separate legal entities given that their separateness did not exist. A great injustice would be bestowed upon the Plaintiff if legal separateness were to be recognized between the Kinderhook entities and Blitz USA.

**Plaintiff's Injuries**

60. As a result of his injuries, Plaintiff has incurred more than six million dollars in medical and related expenses. Michael continues to require additional medical care including surgical procedures which will result in even higher medical bills. Michael has also suffered extreme physical and emotional pain and suffering and psychological injuries which will require care and treatment as well. He has suffered severe, permanent disfigurement.

61. Michael's injuries are permanent and his ability to perform ordinary activities and enjoy life and his ability to earn a living have been permanently and adversely affected.

**FIRST CAUSE OF ACTION**

**(STRICT LIABILITY)**

**Defendant Wal-Mart Stores, Inc.**

Plaintiff re-alleges and incorporates in this count each and every preceding allegation as if fully pled herein.

62. The Blitz subject gasoline container that caused Michael's injuries was defectively designed.

63. Wal-Mart engaged in the business of designing portable gasoline containers with Blitz U.S.A., including the gasoline container in the present case, which Wal-Mart knew was manufactured and sold to consumers within the stream of commerce.

64. Wal-Mart expected the subject gasoline container, so introduced into the stream of commerce, to ultimately reach consumers and/or users without substantial change in the condition in which it was originally designed, manufactured and sold.

65. Similarly, Wal-Mart knew the subject gasoline containers, so introduced and passed on in the course of trade, would be used by those consumers and/or users without inspection for defects.

66. The subject gasoline container in the present case did in fact reach the consumer and/or user without substantial change in the condition in which it was originally designed, manufactured and sold and unexpectedly exploded under ordinary and foreseeable use.

67. At all times complained of, a safer alternative design was available that would have eliminated the risk of such an explosion without substantially impairing the usefulness and intended purpose of the product.

68. The subject gasoline container was defective in that its design did not incorporate a flame arrester, an essential safety device that would have prevented the explosion that occurred in the present case.

///

69. A flame arrester, sometimes called a flash arrester or spark arrester, is a small metal device that is placed in a container's openings and allows liquids to flow out of the container but prevents the flashback of flames back into the container. The device consists of either a perforated metal disc or a woven wire mesh screen.

70. The efficacy of flame arresters has been known to the manufacturing industry, particularly to the manufacturers of portable gasoline containers, since at least the early 1970's.

Flame arresters were first placed in industrial gasoline containers in the 1950's and in consumer gasoline containers by 1978.

71. For more than a quarter century, the utility and efficacy of flame arresters in the context of consumer gasoline containers has been a topic of discussion in the media and national publications and the subject of numerous lawsuits filed by consumers, users, and bystanders that have been burned and/or killed in encounters with portable gasoline containers that were not equipped with the device.

72. Consequently, Wal-Mart and the other Defendants have known, or should have known, for decades prior to this incident that gasoline containers without flame arresters are susceptible to flashback (i.e., when gasoline vapors outside the container ignite, the flames can follow the vapor trail back inside the container causing it to explode and/or spew flames and burning gasoline), which poses a substantial danger to consumers and/or users of the product.

73. Nevertheless, despite the wealth of available scientific knowledge, Wal-Mart and the other Defendants have made, and continue to make, a conscious decision to endanger the safety of consumers, users, and bystanders by refusing to incorporate this simple, well-known safety device into their portable gasoline containers, even when it is apparent within the industry that the small, metal devices are both economically and technologically feasible.

74. The use of the portable gasoline container in the present case was, or should have been, reasonably foreseeable to Wal-Mart and the other Defendants.

75. Without a flame arrester, the portable gasoline container did not perform as safely as an ordinary consumer would expect when used in a reasonably foreseeable manner such as that in the present case.

76. Without a flame arrester, the foreseeable risk of injury and/or death associated with the use of the portable gasoline container far exceeded any utility and/or benefits associated with its design.

77. Further, the portable gasoline container was defective in that Wal-Mart failed to provide adequate warnings of the potential dangers associated with the uses and misuses of the gas can as designed without a flame arrester, specifically the potential for flashback and for explosion of the gas can, which would not be apparent to the ordinary consumer and/or user.

78. At all relevant times, consumers, bystanders, and/or foreseeable users, such as Michael, were not, and still are not, likely to possess knowledge of the extent and magnitude of the risks associated with using these portable gasoline containers as designed, nor could they possibly appreciate the severity of injuries that are likely to occur.

79. Without such knowledge, consumers, bystanders, and/or foreseeable users, such as Plaintiff, would not be in a position to avoid the product's inherent dangers through the exercise of ordinary and reasonable care. Conversely, Wal-Mart and the other Defendants knew, and were certainly in the best position to know, that the subject gasoline container in this lawsuit, as designed, posed a tremendous risk of severe injury and death to consumers, users, and bystanders.

80. Wal-Mart's acts and/or omissions in the design of the defective portable gasoline container was the proximate cause and/or substantial factor in causing Michael's injuries.

81. Wal-Mart had knowledge of the design defects alleged herein at the time of its design and of the subject gas can and acted with complete indifference to and conscious disregard for the safety of Plaintiff and other foreseeable plaintiffs, and therefore an award of punitive damages is appropriate.

## SECOND CAUSE OF ACTION

## (NEGLIGENCE)

**Defendant Wal-Mart Stores, Inc.**

Plaintiff re-alleges and incorporates in this count each and every preceding allegation as if fully pled herein.

82. Defendant Wal-Mart owed consumers, bystanders, and/or foreseeable users, including Plaintiff, the duty of care of a reasonably prudent manufacturer in the design of their portable gasoline containers.

83. Defendant Wal-Mart ignored and/or breached their duty of care by its following negligent acts and/or omissions:

A. Failed to design a reasonably safe portable gasoline container;

B. Designed portable gasoline container that was defective;

C. Placed into the stream of commerce a portable gasoline container that was defective in design;

D. Placed into the stream of commerce a portable gasoline container that was defective in that it failed to contain adequate warnings and instructions;

E. Placed into the stream of commerce a portable gasoline container that was unfit for its foreseeable and intended uses;

F. Placed into the stream of commerce a portable gasoline container likely to cause injury under ordinary and foreseeable use;

G. Failed to guard against flashback in the product design;

H. Failed to incorporate a flame arrester in the product design;

I. Failed to incorporate explosion proofing material in the product design;

J. Failed to incorporate an explosion suppression system in the product design;

K. Failed to inspect for defects in the product design;

L. Failed to guard against the product's hidden or latent defects;

M. Failed to properly test its portable gasoline containers and prototypes thereof with flame arresters and/or explosion suppression materials;

N. Failed to properly inspect and/or test its portable gasoline containers for susceptibility to flashback explosions;

O. Failed to provide adequate instructions and/or warnings with the product after learning, knowing, or having reason to know, of the defects existing in the product that rendered it unreasonably dangerous when used in a reasonably foreseeable manner;

P. Failed to provide adequate instructions and/or warnings with the product after learning, knowing, or having reason to know that consumers and/or users of the product would not realize the potential dangers associated with ordinary and foreseeable use ;

Q. Failed to provide adequate instructions and/or warnings with the product after learning, knowing, or having reason to know that a reasonable manufacturer would have warned of the potential dangers associated with ordinary and foreseeable use under same or similar circumstances;

R. Failed to adequately warn consumers and/or users of the product of the inherent dangers associated with use of its portable gasoline containers;

S. Failed to actively seek information regarding incidents in which consumers, users, and bystanders were injured and/or killed when they encountering such portable gasoline containers;

T. Failed to actively seek information regarding incidents involving explosion and/or internal combustion of portable gasoline containers;

U. Failed to protect foreseeable users of the portable gasoline containers from the dangers present in the use of their containers that it knew or should have known existed;

V. Failed to give adequate notice to consumers and users of the concealed danger, namely that gasoline vapors outside the container, when exposed to an ignition source, can ignite and that the ensuing flames can flashback inside the container, causing internal combustion and explosion;

W. Failed to provide post-sale warnings after learning, knowing, or having reason to know of the defects existing in the product that rendered it unreasonably dangerous for its intended use;

X. Failed to take subsequent remedial measures to recall or retrofit the product after learning, knowing, or having reason to know of the defects existing in the product that rendered it unreasonably dangerous for its intended and foreseeable uses;

/ / /

/ / /

Y. Failed to take subsequent remedial measures to recall or retrofit the product after learning, knowing, or having reason to know that a reasonable manufacturer would have recall or retrofitted the product under same or similar circumstances;

Z. Ignored or failed to investigate complaints about the defects existing in the product that rendered it unreasonably dangerous for its intended use;

AA. Ignored or failed to investigate scientific, technological, and industry information and studies regarding the efficacy of flame arresters and/or explosion suppression materials;

BB. Ignored or failed to investigate media reports and national publications relating to the dangers and risks involved with the use of portable gasoline containers that do not contain flame arresters;

CC. Ignored and/or failed to investigate other lawsuits involving similar claims and incidents in which consumers, users, and/or bystanders were severely and routinely burned and/or killed when encountering such portable gasoline containers;

DD. Ignored and/or failed to investigate similar incidents involving portable gasoline containers; and/or

EE. Failed to report incidences and lawsuits involving other consumers, users, and bystanders, who have been burned and/or killed when encountering the portable gasoline containers to the Consumer Product Safety Commission;

84. As an actual and proximate result of Wal-Mart's negligent acts and/or omissions, the portable gasoline container that caused Plaintiff's injuries was placed into the stream of commerce in a defective and unreasonably dangerous condition;

85. As an actual and proximate result of Wal-Mart's negligent acts and/or omissions, Plaintiff was subjected to the occurrence which makes the basis of this suit and has suffered the resulting injuries and damages described herein.

86. Michael's injuries and the manner in which they occurred were reasonably foreseeable to Wal-Mart and the other Defendants who had actual and/or constructive knowledge, from within the industry, national publications, and prior lawsuits, that consumers, users, and

bystanders were being routinely burned and/or killed when encountering their portable gasoline containers.

87. Wal-Mart's acts and/or omissions in the design, manufacture, assembly, marketing, distribution, and sale of the defective portable gasoline container were the proximate cause and/or substantial factor in causing Michael's injuries.

88. Wal-Mart had knowledge of the design defects alleged herein at the time of its design and of the subject gas can and acted with complete indifference to and conscious disregard for the safety of Plaintiff and other foreseeable plaintiffs, and therefore an award of punitive damages is appropriate.

**THIRD CAUSE OF ACTION**

**(BREACH OF WARRANTY)**

**Defendant Wal-Mart Stores, Inc.**

Plaintiff re-alleges and incorporates in this count each and every preceding allegation as if fully pled herein.

89. Defendant Wal-Mart, by and through its design of the portable gasoline container, expressly and impliedly warranted to the consumer and/or foreseeable users, such as M ichael, that the container was reasonably safe and fit for its ordinary and foreseeable purposes.

90. Wal-Mart knew, or should have known, that consumers and/or users, such as Michael, intended to use the portable gasoline containers for ordinary and foreseeable purposes and that consumers and/or users, such as Michael, were relying on Defendants' skill and judgment in designing containers suitable for those purposes.

91. Michael made ordinary and foreseeable use of the container in reliance on said warranties.

92. Contrary to said warranties, the portable gasoline container was defective and unfit for its ordinary and foreseeable purposes, rendering it unreasonably dangerous.

/ / /

/ / /

93. As an actual and proximate result of Defendants' breach of said warranties, the portable gasoline container was placed into the stream of commerce in a defective and unreasonably dangerous condition.

94. As an actual and proximate result of Wal-Mart's breach of said warranties, Plaintiff suffered catastrophic burn injuries when the container unexpectedly and violently exploded.

95. Plaintiff's injuries and the manner in which they occurred were reasonably foreseeable to Wal-Mart and the other Defendants who had actual and/or constructive knowledge, from within the industry, national publications, and prior lawsuits, that consumers, users, and bystanders were being routinely burned and/or killed when encountering their portable gasoline containers.

96. Wal-Mart breached its express and implied warranties by the failure of the gasoline container itself and by improper failure to warn of the risks associated with the use of its product and failure to provide instructions for safe operation.

## FOURTH CAUSE OF ACTION

## (MISREPRESENTATION)

**Defendant Wal-Mart Stores, Inc.**

Plaintiff re-alleges and incorporates in this count each and every preceding allegation as if fully pled herein.

97. Defendant Wal-Mart is strictly liable to Plaintiff pursuant to § 402B of the Restatement (Second) of Torts, for misrepresenting to consumers and/or foreseeable users, such as Plaintiff, that its portable gasoline containers were safe and without defect.

98. Such representation was false and involved a material fact concerning the character or quality of the gasoline container in question.

99. Plaintiff justifiably relied on such representation which constituted a proximate and producing cause of his injuries.

/ / /

/ / /

**FIFTH CAUSE OF ACTION**

**(VIOLATIONS OF THE CONSUMER PRODUCT SAFETY ACT)**

**Defendant Wal-Mart Stores, Inc.**

Plaintiff re-alleges and incorporates in this count each and every preceding allegation as if fully pled herein.

100. Pursuant to § 23(a) of the Consumer Product Safety Act, 15 U.S.C. § 2072, Defendant Wal-Mart is liable for the following:

A. Failing to report a defective and potentially hazardous product to the Consumer Product Safety Commission as required by § 15(b) of the Act, 15 U.S.C. § 2064.

B. Failing to report information pertaining to settled or adjudicated lawsuits for death or grievous bodily injury to the Consumer Product Safety Commission as required by § 37 of the Act, 15 U.S.C.A. § 2084.

101. Wal-Mart's violations of the consumer product safety rules were done knowingly and/or willfully.

102. Wal-Mart's failure to report the prior claims and/or potential hazards associated with portable gasoline containers that it designed and that it sold was a proximate cause of Michael's injuries.

**SIXTH CAUSE OF ACTION**

**(NEGLIGENCE PER SE)**

**Defendant Wal-Mart Stores, Inc.**

Plaintiff re-alleges and incorporates in this count each and every preceding allegation as if fully pled herein.

103. Defendant Wal-Mart's failure to report the prior claims and/or potential hazards associated with its portable gasoline containers as required by the Consumer Product Safety Act, 15 U.S.C. § 2064, 2084, constituted negligence per se.

104. As a user of a consumer product, Michael was a member of the class of persons the statute was designed to protect and his injuries are of the type the statute was designed to prevent.

105. Because Defendant Wal-Mart failed to report the prior claims and/or potential hazards associated with its defective and unreasonably dangerous portable gasoline containers, it was foreseeable that a user of the product, such as Plaintiff, could be severely injured and/or killed when the container unexpectedly and violently exploded.

106. Defendant Wal-Mart's violations of the consumer product safety rules were done without excuse.

107. Defendant Wal-Mart's failure to report the prior claims and/or potential hazards associated with portable gasoline containers that it designed and it sold was a proximate cause of Michael's injuries.

**SEVENTH CAUSE OF ACTION**

**(PIERCING THE CORPORATE VIEL AND JOINT ENTERPRISE LIABILTY)**

**Defendants Elmburgs, Flick, Bergan and Crestwood**

Plaintiff realleges and incorporates in this count each and every preceding allegation as though fully pled herein.

108. The gasoline container that exploded and burned Plaintiff was designed, manufactured and sold by Blitz, U.S.A., Inc.

109. Blitz was owned and operated by John "Cy" Elmburg, Robert Elmburg, and Eric Elmburg until approximately 2006 when Crestwood Holdings was established to own and hold Blitz assets.

110. In the 2004/2005 time frame, Blitz had been sued repeatedly in lawsuits for designing, manufacturing and selling gas cans that lacked safety devices, known as flame arrestors to prevent explosion. In these cases, Blitz gas cans had exploded and severely burned and killed multiple consumers, the majority of which were children.

111. At all relevant times, the Elmburgs and Flick knew that Blitz gas cans were defectively designed and sold because they were not equipped with a flame arrestor.

112. As a result of the liability exposure due to a growing number of gas can lawsuits, Blitz's owners, the Elmburgs, and Blitz's President and CEO, Rocky Flick, retained a management consulting firm to advise them on how to deal with business strategy.

113. The business strategy proposed and adopted by the Defendants Elmburgs and Flick included the strategy of "get the money out before the liability goes up" and "equity reduction."

114. Rocky Flick admitted under oath that the purpose behind this strategy was to drain the company of its assets so that if a burned consumer received a large jury award, there would be no assets for that person, such as Michael to recover.

115. The lawsuits against Blitz involved catastrophically burned plaintiffs most of whom have been burned over more than 50% of their bodies and the majority of whom were children.

116. At one time, Blitz had flame arrestors on its metal gas cans but when it began making plastic cans, it removed the arrestors from the design, leaving consumers vulnerable to the risk of explosion.

117. Since the early 1990s, lawsuits against Blitz have involved claims for hundreds of millions of dollars of medical bills, claims for excruciating pain and suffering, vocational loss, psychiatric impact and permanent disfigurement.

118. Despite this fact, Blitz's owners and executives retained relatively modest amounts of insurance leaving it grossly underinsured.

119. In the year Michael was burned and injured, Blitz has exhausted its insurance coverage and the company is now in bankruptcy, leaving Michael, exactly as the Elmburgs and Flick intended, without assets to recover from Blitz.

120. To execute the strategy of getting the money out before the liability went up, the Elmburgs and Flick divided Blitz's assets between Blitz and Defendant Bergan, L.L.C. ("Bergan") to transfer all of Blitz's non-gas can assets into Bergan to shield them from product liability for Blitz' gas can lawsuits. Crestwood Holdings, Inc. was formed to hold the stock. Flick was given an ownership interest for his participation and complicity. The sole purpose for these transactions was to leave plaintiffs, including Michael Montgomery, uncompensated for their horrific injuries.

121. The Elmburgs, Flick, and Crestwood then set out to sell Blitz, USA and pocket millions of dollars in proceeds before those who were injured could obtain the assets.

122. The Elmburgs, Flick and Crestwood diverted the assets of Blitz for their own personal gain for the purpose hindering, delaying and defrauding Plaintiff and others like him who

had been injured by their gas cans. The Elmburgs and Flick managed Crestwood and Blitz in a manner that its separate corporate identity no longer existed.

123. The Elmburgs, Flick, Crestwood, Blitz USA and Bergan disregarded corporate formalities in their actual operations and specifically sought to fraudulently avoid paying any lawful judgment obtained in cases where Blitz gas cans exploded leaving any entity grossly undercapitalized and under insured.

124. Through a series of transactions with related corporations, on or about September 19, 2007, Blitz USA was sold by Crestwood to a New York venture capital firm known as Kinderhook Industries, LLC. The Elmburgs, Flick and Crestwood pocketed millions of dollars that otherwise would have gone to those who were injured by their exploding gas cans.

125. On September 2, 2007, a Press Release was made announcing Kinderhook Industries, L.L.C.'s purchase of Blitz U.S.A., Inc. which stated in part as follows:

Blitz USA one of the nation's premiere product manufactures, has signed an agreement to sell the company to an investment group which includes Blitz's current President Rocky Flick and Kinderhook Industries, LLC, a New York-based private equity firm. The announcement was made by Blitz owner John R. "Cy" Elmburg. Elmburg, who will retire following completion of the sale, said several members of the current management team at Blitz USA, including Rocky Flick have also acquired equity positions in the company in the transaction. Flick will become CEO following the close of the transaction, which is expected to be completed in the coming week. Elmburg's two sons will also be selling their company equity at this time. The Pet Division of Blitz USA, which is now Bergan L.L.C., will not be a part of the transaction. 126. Each of these transfers, transactions and other actions of Defendants Elmburg, Flick Crestwood and Bergan were made with the actual intent to hinder, delay or defraud Plaintiff and others like him and, therefore, an award of punitive damages is appropriate.

127. A great injustice would be forced upon Plaintiff if the Court were not to recognize the legal fiction of corporate separateness.

/ / /

/ / /

## EIGHT CAUSE OF ACTION

## (PIERCING THE CORPORATE VEIL)

### The Kinderhook Defendants

Plaintiffs reallege and incorporate in this count each and every preceding allegation as though fully pled herein.

128. As a result of complicated transactions which were all part of Kinderhook's purchase in 2007, Kinderhook Capital Fund II, L.P. finally ended up with the stock of Blitz through various corporate transactions by and through Kinderhook entities including Kinderhook Industries, L.L.C. and Kinderhook Industries II, L.P. (The three Kinderhook Defendants shall be referred to as "Kinderhook").

129. Upon completion of the sale, Kinderhook restructured the ownership of Blitz USA into a series of interdependent subsidiary holding companies comprised of a series of Delaware limited liability companies and corporations. In the end, Kinderhook Capital Fund II, L.P. gained ownership of Blitz Holdings, LLC which owned Blitz Acquisition Holdings, Inc., which owned Blitz Acquisitions, LLC which owned Blitz U.S.A., Inc. and Blitz RE Holdings, LLC.

130. As part of this restructuring, Kinderhook saddled Blitz with extraordinary amounts of debt, investing very little if any of its own equity in the company. The once vibrant business was now inadequately capitalized and grossly underinsured with a Board controlled by Kinderhook directors.

131. Through these transactions, Kinderhook set up a maze of corporations in a single minded attempt to insulate Blitz's assets from those individuals that the Defendants knew Blitz's gas cans already had and were continuing to injure.

132. Kinderhook then engaged in a series of transactions to drain Blitz's assets which were not conducted at arm's length.

133. Blitz paid hundreds of thousands of dollars in management fees to Kinderhook Industries II, LP whose ultimate parent was Kinderhook Industries, Inc. The amount paid in management fees to the related entity was grossly disproportional to the amount paid to the on-site managers of Blitz USA.

134. In November of 2010, Blitz USA's gas can was found to be defective in a product liability suit in Federal Court in Utah where the jury returned a verdict for six million dollars in the death of a toddler.

135. Kinderhook immediately renegotiated Blitz's debt, increasing the burden on Blitz USA and placing Blitz in a situation where it was even more undercapitalized.

136. In February of 2011, Blitz transferred millions of dollars to Blitz Acquisitions Holdings, Inc. in yet another attempt to get assets out of Blitz. Blitz Acquisitions Holdings then purchased Reliance, a Canadian blow molding company, with the millions of dollars belonging to Blitz. This acquisition allowed Kinderhook to claim in Blitz's bankruptcy that Kinderhook was entitled to the proceeds of any sale of Reliance instead of those who had been burned and left without adequate assets to compensate them for their injuries. The sole purpose of this transaction was to benefit Kinderhook and harm the Plaintiff in this lawsuit and others like him who had been injured by Blitz' products.

137. In November of 2012, Blitz filed for Chapter 11 bankruptcy protection through which it sold off substantially all of its assets in August of 2012.

138. Kinderhook's management of Blitz was conducted with the sole purpose of draining money from Blitz USA and those who had been injured by their products to related corporate entities. These entities should not be recognized as separate legal entities given that their separateness did not exist. A great injustice would be bestowed upon the Plaintiff if legal separateness were to be recognized between the Kinderhook entities and Blitz USA.

139. Kinderhook has disregarded corporate formalities between Blitz and other subsidiary companies in their actual operation in the following ways:

a. By treating funds, assets and liabilities of one company as the funds, assets and liabilities of the other companies;

b. Blitz Holdings, LLC guaranteed the credit facility of its subsidiary companies;

c. Blitz Holdings, LLC made inter-company loans to three of its subsidiaries secured with assets of the remaining subsidiary;

d. Blitz Holdings LLC funneled funds back and forth between it and each of its subsidiaries to such an extent that they operated as a single treasury;

e. Blitz Holdings, LLC used this method of financing to deplete the assets of its subsidiary companies by means of a bargain sale;

f. Blitz Holdings, LLC and its subsidiary companies were located at the same address, employ the same employees and managers and used the same attorneys and accountants;

g. Blitz Holdings, LLC grossly undercapitalized and underinsured its subsidiary Blitz U.S.A., Inc. for its corporate undertaking as evidenced by its product liability and recent bankruptcy;

h. Diverted the assets of Blitz to one of its subsidiary companies for the express purpose of depriving existing and future Plaintiffs in product liability lawsuits, including Plaintiff, from recovering on lawful judgments;

i. Paid exorbitant management fees to a Kinderhook entity;

j. Failed to maintain arm's length relationships between its subsidiary companies; and

k. Blitz Holdings, LLC and its subsidiary companies have failed to maintain separate corporate records, accounting records and meeting minutes for each company.

140. Kinderhook Formed Reliance Products Holdings, Inc. to fraudulently transfer monies from Blitz USA to Blitz Acquisition Holdings, Inc. in order to divert assets from Blitz, USA knowing that Blitz was insolvent. (On April 8, 2011, Kinderhook changed the name of Blitz Holdings LLC to LAM 2011 Holdings, LLC.)

141. Kinderhook has disregarded the corporate formalities of LAM 2011 Holdings in the same way it has the other Blitz entities. Kinderhook represented F3 Brands, as being a wholly owned subsidiary of Blitz USA while in actuality distributing F3's shares to the individual shareholders of LAM.

/ / /

/ / /

142. Kinderhook created the described corporate structure and transactions to primarily avoid paying any lawful judgment obtained against the subsidiary manufacturer of the gas cans which were known to Kinderhook.

143. Kinderhook repeatedly used a sham of separateness afforded by the corporate form to fraudulently achieve shareholder limited liability.

144. Each of these transfers, transactions and the other conduct described was made with the actual intent to hinder, delay or defraud Plaintiff and/or other creditors of Blitz and, therefore, an award of punitive damages is appropriate.

145. A great injustice would be forced upon Plaintiff if the Court were not to recognize the legal fiction of corporate separateness.

## NINTH CAUSE OF ACTION

## (FRAUDULENT CONVEYANCE)

**The Elmburgs, Flick, Bergan and Crestwood**

Plaintiff realleges and incorporates in this count each and every preceding allegation as though fully pled herein.

146. The sale from the Elmburgs, Flick and Crestwood to Kinderhook of Blitz and its related entities constituted a fraudulent conveyance under California's Uniform Fraudulent Transfers Act.

147. The purpose of the conveyance to Kinderhook was for the Elmburgs, Flick and Crestwood to avoid product liability and get their assets out before their liability went up and therefore, to delay and defraud those who had been injured and were rightfully entitled to the assets.

148. The Elmburgs profited by millions of dollars more than they had been offered just a year before in order to complete this fraud on those who had been burned by their defective gas cans.

149. Each of these transfers, transactions and the other conduct described was made with the actual intent to hinder, delay or defraud Plaintiff and/or other creditors of Blitz and, therefore, an award of punitive damages is appropriate.

**TENTH CAUSE OF ACTION**

**(FRAUDULENT CONVEYANCE)**

**The Kinderhook Defendants**

Plaintiff realleges and incorporates in this count each and every preceding allegation as though fully pled herein.

150. Kinderhook's conveyances of monies belonging to Blitz to purchase Reliance and the payment of excessive management fees constituted fraudulent conveyances by Kinderhook for the sole purpose of defrauding those who had been burned by their defective gas cans.

151. Each of these transfers, transactions and the other conduct described was made with the actual intent to hinder, delay or defraud Plaintiff and/or other creditors of Blitz and, therefore, an award of punitive damages is appropriate.

**ELEVENTH CAUSE OF ACTION**

**(STRICT LIABILITY DESIGN DEFECT)**

**Defendant Home Depot U.S.A., Inc.**

Plaintiff re-alleges and incorporates in this count each and every preceding allegations as if fully pled herein.

152. The subject gas can was marketed and sold by Home Depot.

153. The subject gas can was defective and/or unreasonably dangerous when sold.

154. The subject gas can was the producing cause of Michael Montgomery's injuries and the damages sought by Plaintiff herein.

155. Home Depot is engaged in the business of designing, marketing and selling portable gas cans, including the subject gas can, to consumers within the stream of commerce.

156. Home Depot had actual knowledge of the defect in the subject gas can which caused the injury prior to the sale of the can that exploded and burned Michael because Home Depot had been sued in other product liability cases involving defective gas cans that exploded and injured Home Depot customers due to the failure of the gas cans to be equipped with flame arrestors.

/ / /

157. The subject gas can was without substantial change in the condition in which it was originally designed and sold by Home Depot and unexpectedly failed under ordinary and foreseeable use.

158. At the time the subject gas can left Home Depot's control, and at all times complained of, safer alternative designs were available that would have eliminated the risk of the subject gas can exploding without substantially impairing the usefulness and intended purpose of the product and Home Depot was aware of these safer alternatives but chose to design and sell the unreasonably dangerous subject gas can.

159. The subject gas can was unreasonably dangerous and defective in that its design and construction did not incorporate a flame arrestor, a technologically and economically feasible safety device that would have prevented the explosion in the present case.

160. Without the inclusion of a flame arrestor, the foreseeable risk of injury and/or death associated with the use of the subject gas can far exceeded any utility and/or benefits associated with its design.

161. Nevertheless, despite the wealth of available scientific knowledge and knowledge of injuries suffered by other customers, Home Depot has made, and continues to make, a conscious decision to endanger the safety of consumers, users, and bystanders by selling plastic gas cans without this necessary safety device.

162. As a direct and proximate result of Home Depot's acts or missions as described herein and as a direct and proximate result of the subject gas can's effective design, Plaintiff suffered severe burn injuries and has incurred damages.

163. Home Depot had knowledge of the design defects alleged herein at the time it sold the subject gas can and acted with complete indifference to and conscious disregard for the safety of Plaintiff and other foreseeable plaintiffs, and therefore an award of punitive damages is appropriate.

///

///

///

///

**TWELVTH CAUSE OF ACTION**

**(DUTY TO WARN)**

**Defendant Home Depot U.S.A., Inc.**

Plaintiff re-alleges and incorporates in this count each and every preceding allegation as if fully pled herein.

164. Home Depot owed a duty to warn customers such as the Plaintiff of the foreseeable risk associated of using a plastic gas can without a flame arrestor.

165. Home Depot failed to provide adequate warnings that would be reasonably calculated to catch the attention of a reasonably prudent person given that its warnings were not conspicuous.

166. At the time the portable gas can left Home Depot's control, consumers and/or foreseeable users, such as Michael Montgomery, were not and still are not, likely to possess the knowledge of the extent and magnitude of the risks associated with using the Blitz portable gas cans without flame arrestors.

167. Without such knowledge, consumers and/or foreseeable users would not be in a position to avoid the product's inherent dangers through the exercise of ordinary and reasonable care. Conversely, Home Depot knew that portable gas cans, as designed without flame arrestors, posed a tremendous and horrific risk of injury to consumers, users, and bystanders. The knowledge was gained through lawsuits in which Home Depot was sued for selling dangerous gas cans that exploded and caused burn injuries similar to those suffered by Michael Montgomery.

168. As a direct proximate result of Home Depot's failures to warn of the subject gas can's defective design, Michael Montgomery suffered severe burn injuries. These burn injuries were foreseeable by Home Depot.

169. As such, Home Depot is liable pursuant to California law including violating the duty to warn of non-obvious foreseeable dangers from the normal use of the products.

170. Home Depot had knowledge of the design defects alleged herein at the time it sold the subject gas can and acted with complete indifference to and conscious disregard for the safety of Plaintiff and other foreseeable plaintiffs, and therefore an award of punitive damages is appropriate.

**<u>THIRTEENTH CAUSE OF ACTION</u>**

**(NEGLIGENCE)**

**Defendant Home Depot U.S.A., Inc.**

Plaintiff re-alleges and incorporates in this count each and every preceding allegation as if fully pled herein.

171. Home Depot owed consumers and/or foreseeable users, including Michael Montgomery, the duty of reasonable care in its marketing, distribution and sale of the Subject Gas Can.

172. Home Depot ignored and/or breached that duty by its following negligent acts and/or omissions:

a. Selling a portable gas can that was unreasonably dangerous and lacked an inexpensive flame arrestor safety device;

b. Knowingly selling a portable gas can that was defective and unreasonably dangerous;

c. Knowingly placing into the stream of commerce a portable gas can likely to cause injury in its ordinary use;

d. Knowingly selling a portable gas can that did not include a flame arrestor;

e. Failing to provide adequate instructions and warnings with the product after learning; knowing, or having reason to know, of the defects existing in the product that rendered it unreasonably dangerous for its intended use;

f. Home Depot knew or should have known that consumers would use gas cans without flame arrestors sold by Home Depot to start and/or maintain a fire, creating an unreasonable and unexpected hazard of vapor ignition and resulting fire, without appropriate design features to prevent ignition and flashback.

173. As an actual and proximate result Home Depot's negligent acts and/or omissions, the subject gas can that caused Michael Montgomery's injuries was placed into the stream of commerce in a defective and unreasonably dangerous condition. Michael Montgomery's injuries and the

manner in which they occurred were reasonably foreseeable to Home Depot, which had actual and/or constructive knowledge from media reports and prior claims and lawsuits, that consumers, users, and bystanders were being routinely burned and/or killed when encountering portable gas cans sold by them without flame arrestors.

174. As a direct and proximate result of Home Depot's negligent acts or omissions as described herein, Plaintiff Michael Montgomery suffered severe burn injuries has incurred damages.

**CAUSATION AND DAMAGES**

Plaintiff re-alleges and incorporates in this count each and every preceding allegation as if fully pled herein.

175. Defendants caused Michael Montgomery significant and permanent injury and harm as a result of the negligence and other tortious conduct set forth herein. Plaintiff demands money damages consistent with California law for the harm inflicted by Defendants, including, but not limited to the following:

a. Past and future costs of medical care;

b. Past and future loss of wages, entitlements, support and other recoverable economic losses;

c. Past and future emotional distress;

d. Past and future pain and suffering;

e. Past and future hedonic damages; and

f. Punitive damages.

WHEREFORE, Michael Montgomery prays that he be awarded all compensatory damages due and owed; that he be awarded punitive damages on any and all Counts on which punitive damages are recoverable; for his attorney's fees and costs associated with the prosecution of this action, as allowed by California law, and for such other and further relief as this Honorable Court deems just and proper.

/ / /

/ / /

**DEMAND FOR JURY TRIAL**

Michael Montgomery demands that his case be heard and resolved by a jury of his peers.

Dated: December 20, 2012 FERGUSON CASE ORR PATERSON LLP

S/David L. Shain
Attorneys for Plaintiff
David Montgomery, Individually
and as guardian ad litem of
Michael Dean Montgomery, a Minor

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

DAVID MONTGOMERY, Individually and as Guardian Ad Litem of MICHAEL DEAN MONTGOMERY, a Minor

**DEFENDANTS**

(SEE ATTACHMENT)

(b) County of Residence of First Listed Plaintiff San Diego, CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Benton County, AR
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
David L. Shain, Ferguson Case Orr Paterson LLP, 1050 South Kimball Road, Ventura, CA 93004, 805-659-6800.

Attorneys *(If Known)*
'12CV3034 DMS WVG

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Med. Malpractice

PERSONAL INJURY
- ☒ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

**Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition)
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district *(specify)* ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
28 U.S.C. § 1332; 15 U.S.C. § 2072; 28 U.S.C. § 1391(a)(2)

Brief description of cause:
Explosion of gasoline container causing injuries and damages to plaintiffs.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ____________ DOCKET NUMBER ____________

DATE
12/20/2012

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

MC-025

| SHORT TITLE: David Montgomery, Individually and as Guardian ad Litem of Michael Dean Montgomery v. Wal-Mart Stores, Inc., et al. | CASE NUMBER: |
|---|---|

**ATTACHMENT** *(Number)*: ONE (1)

*(This Attachment may be used with any Judicial Council form.)*

WAL-MART STORES, INC.;

KINDERHOOK INDUSTRIES II, L.P.;

KINDERHOOK INDUSTRIES, L.L.C.;

KINDERHOOK CAPITAL FUND II, L.P.;

CRESTWOOD HOLDINGS, INC.;

BERGAN, L.L.C.;

JOHN ELMBURG;

ROBERT ELMBURG;

ERIC ELMBURG;

ROCKY FLICK;

HOME DEPOT U.S.A., INC.;

and Does 1 through 20, inclusive.

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

**Page** 1 **of** 1

*(Add pages as required)*

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction**. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit**. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin**. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.** **Cause of Action**. Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity**. Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint**. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases**. This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**. Date and sign the civil cover sheet.

JS 44 Reverse (Rev. 09/11)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.